IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE SAYLES, | ) | CASE NO.   1:25 CV 1537 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| ASHTABULA METROPOLITAN | ) | **MEMORANDUM OPINION** |
| HOUSING AUTHORITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant,

Ashtabula Metropolitan Housing Authority ("AMHA") (Docket #22) and the Motion for Partial

Summary Judgment filed by Plaintiff, Valerie Sayles ("Ms. Sayles") (Docket #29).

I.      **Factual and Procedural Background.[1]**

From June 2013 until May 27, 2024, Ms. Sayles was a tenant of AMHA, residing at 6214

Bardmoor Blvd., Ashtabula, Ohio ("the Property").  Ms. Sayles' most recent Lease Agreement

("the Lease") was executed on June 1, 2022 and renewed on June 1, 2023 for an additional 12

months.  (Docket #21-1; Docket #31 at p. 6.)

---

[1]

        The facts as stated in this Memorandum Opinion and Order are taken from the
Parties' submissions.  Those material facts that are controverted and supported by
deposition testimony, affidavit, or other evidence are stated in the light most favorable to
the non-moving Party.

On multiple occasions during her tenancy, Ms. Sayles was found to be in violation of AMHA's Housekeeping Standards.  Eventually, as discussed more fully below, AMHA decided to evict Ms. Sayles and this lawsuit followed.  Ms. Sayles alleges that her noncompliance with the Housekeeping Standards set forth in the Lease was due to a disability; that AMHA failed to provide her with an accommodation; and, that she was wrongfully and/or constructively evicted from the Property.  Ms. Sayles also alleges that AMHA failed to adhere to the express terms of the Lease regarding inspections and the hearing process.

### A.    Relevant Lease Provisions.

Paragraph 15 of the Lease, entitled "Housekeeping Standards," provides in part as follows:

> **15.1.    AMHA Responsibility:** The standards below will be applied fairly and uniformly to all Tenants.  AMHA will inspect each unit at least annually, to determine compliance with these standards.  Upon completion of an inspection AMHA will notify the Tenant in writing if he/she fails to comply with these standards.  AMHA will advise Tenant of the specific correction(s) required to establish compliance, and indicating [sic] that training is available.  Within a reasonable period of time a minimum of seven (7) days, AMHA will schedule a second inspection.  Failure of a second inspection will constitute a violation of the lease terms.  Training will be available at no cost to any Tenant requesting or needing assistance in complying with the Housekeeping Standards.
>
> **15.2.    Tenant Responsibility:** Tenant is required to abide by the standards set forth below.  Failure to abide by the Housekeeping Standards that result in the creation or maintenance of a threat to health or safety is a violation of the lease terms and can result in eviction.

(Docket #21-1.)  Paragraph 15.3 sets forth specific and detailed interior Housekeeping Standards.

Chapter 13 of the Lease, entitled "Termination of the Lease," provides in relevant part as follows:

13.1.   In terminating the Lease, the following procedures shall be followed by AMHA and Tenant: **This Lease may be terminated for serious or repeated violations of material terms of the Lease**, such as failure to make payments due under the lease or to fulfill Tenant obligations set forth in section X above, or for other good cause (24 C.F.R § 966.4.l(2)(iii)).  **Serious or repeated violation of terms shall include** but are not be [sic] limited to:

*   *   *

13.1.7.  **Serious or repeated damage to the dwelling unit, creation of physical hazards in the unit,** common areas, grounds, or parking areas of any AMHA site.

(Docket #21-1.)(Emphasis added.)

Chapter 7 of the Lease, entitled "Responsibilities of AMHA [24 CFR 966.4(e)]," includes notice requirements with which AMHA must comply before any proposed adverse action is taken and also provides that AMHA must afford tenants the opportunity for a hearing under AMHA grievance procedures.  Section 7 requires AMHA:

7.10    To notify Tenant of the specific grounds for any proposed adverse action by AMHA.  (Such adverse action includes, but is not limited to: a proposed lease termination, . . .) When AMHA is required to afford Tenant the opportunity for a hearing under AMHA grievance procedure for a grievance concerning a proposed adverse action, AMHA will comply with the terms of the Admissions and Continued Occupancy Policy, including:

7.10.1. The Notice of the proposed adverse action shall inform Tenant of the right to request such hearing.  In the case of lease termination, a notice of lease termination that complies with 24 CFR 966.4(l)(3) shall constitute adequate notice of proposed adverse action.

*   *   *

-3-

> 7.10.3. **The grievance hearing must be conducted by an impartial person or persons appointed by AMHA, other than the person who made or approved the action under review, or a subordinate of such person.** AMHA grievance hearings will be conducted by a single hearing officer and not a panel. All grievance procedures will follow the terms of the Admissions and Continued Occupancy Policy.

(Docket #21-1.)(Emphasis added.)

### B.    Failed Housekeeping Inspections.

Ms. Sayles failed housekeeping inspections on June 14, 2019; July 9, 2019; June 18, 2020; June 10, 2021; April 27, 2022; and, December 21, 2022. (Docket #22-1 at p. 7.) After each of these failed inspections, Ms. Sayles was given a written report of the areas that failed to meet AMHA's Housekeeping Standards and the Property was reinspected at least one week later.[2] (Docket #31 at Exhibit 13.) Ms. Sayles passed each of the reinspections.

On May 26, 2023, Ms. Sayles failed another inspection of the Property and was given a written, itemized list of specific areas of non-compliance with the Housekeeping Standards set forth in the Lease. (Docket #31 at Exhibit 14.) On June 13, 2023, with cleaning assistance from her sister, Ms. Sayles passed a reinspection. (Docket #31 at p. 7.) In a letter dated that same day, AMHA notified Ms. Sayles as follows:

---

[2]    Ms. Sayles testified during deposition that she believed all of AMHA's "paperwork" regarding inspections and violations of the Lease housekeeping terms to be "inaccurate." (Docket #16 at p. 29.) Ms. Sayles testified that AMHA "just [kept] reprinting the same paperwork" and that "none of it is accurate." (Id. at pp. 36-37.) She testified her house was compliant "most of the time," and that her house is "not dirty" but that AMHA was worried about "clutter or whatever and my house not being organized." (Id. at p. 36.)

> We have conducted several inspections within the past year due to poor housekeeping and safety issues, going above and beyond your "two" chances. Failure to abide by the Housekeeping Standards that result in the creation or maintenance of a threat to health and safety is a violation of the lease terms and can result in eviction.
>
> We will be inspecting your unit again within the year to ensure that you are maintaining your unit.  We are required to give you at least a 24-hour notice. **Please note that if you fail one more inspection, we will proceed with eviction.**
>
> If you need further guidance, assistance or cleaning supplies please don't hesitate to contact us.

(Emphasis added.) (Docket #21-3.)  Ms. Sayles did not contact AMHA to request any additional support, but asserts that because she passed the June 13, 2023 inspection, there was "no need to request additional time, assistance, or a reasonable accommodation from an AMHA policy or procedure."  (Docket #31 at p. 7.)

Six months later, on December 13, 2023, AMHA conducted an inspection of the Property.  (Docket #29-1 at p. 7.)  In her Declaration, AMHA Property Manager Deborah Tharp states that AMHA conducted the December 13, 2023 inspection in response to complaints it received on December 11, 2023 from Ms. Sayles' "neighbors and AMHA maintenance staff about noise, property destruction, and suspected domestic violence between Sayles and her daughter(s)."  (Docket #21 at p. 3.)[3]  AMHA Executive Director Tatreko Sean Adams and Property Manager Tharp were present.  (Docket #29-1 at p. 7.)   During the inspection, Executive Director Adams and Property Manager Tharp encountered cluttered floors; trash bags

---

[3]  Photographs of broken doors were emailed to Ms. Tharp on December 8, 2023. (Docket #16-5.)

-5-

throughout the home; rooms that were difficult to access due to the presence of debris in the halls and doorways; broken doors; and, holes in the walls.[4]  (Docket #22-1 at p. 8.)  Photos were taken during the inspection.  (Docket #21 at Exhibits D1-D6.)

On December 14, 2023, AMHA posted a 30-day Notice of Eviction.  Ms. Sayles was not provided written notice of any violation or the specific corrections needed to comply with the Lease requirements; was not offered additional housekeeping training; and, was not offered time to remedy the deficiencies.  (Docket #29-1 at p. 7.)  The Eviction Notice listed the following Lease violations:

> **HISTORY OF FAILING TO MAINTAIN UNIT IN DECENT SAFE AND SANITARY CONDITION, HISTORY OF TALKING BACK AND THREATENING STAFF MEMBERS, HISTORY OF SERIOUS DAMAGE TO UNIT POSING HEALTH AND SAFETY ISSUES.**
>
> **Section 8.11.**  To refrain from, or to cause household members and guests to refrain from destroying, defacing, damaging, or removing any part of dwelling unit or project.
>
> **Section 8.17.**  To act in a cooperative manner with neighbors and AMHA staff. To refrain from and cause members of tenant's household or guests to refrain from acting or speaking in an abusive or threatening manner toward neighbors and AMHA staff.
>
> **Section 8.20.**  To avoid obstructing sidewalks, areaways, galleries, passages, or stairs, and to avoid using these for purposes other than going in and out of the dwelling unit.
>
> **Section 13.1.7.**  Serious or repeated damage to the dwelling unit, creation of physical hazards in the unit, common areas, grounds, or parking areas of any AMHA site.

---

[4]  Ms. Sayles testified during deposition that the holes in the wall were from her daughter.  (Docket #81 at p. 108.)  Ms. Sayles Signature Health Case Manager, Dana Knight, documented that in February 2024, Ms. Sayles told her that "her daughter [had] been throwing things in the home, and destroying her property" and that Ms. Sayles "stated she is moving to Willoughby because she fears she will become homeless." (Docket #17 at p. 28.)

**Section 15.3.2.** Floors: should be clean, clear, dry and free of hazards.

**Section 15.3.8.** Trash: shall be disposed of properly and not left in the unit.

(Docket #19-6.)

Ms. Sayles contested the 30-day notice of eviction and requested a hearing. On January 4, 2024, AMHA conducted an informal hearing. (Docket #29-1 at p. 7.) Ms. Sayles brought her Signature Health Case Manager, Dana Knight, with her to the hearing.[5] (Id.) Ms. Sayles did not have an attorney. AMHA Executive Director Adams and AMHA Property Manager Tharp were present. (Id.) During the hearing, AMHA discussed Ms. Sayles' housekeeping struggles and possible training with Ms. Knight, who requested time to work with Ms. Sayles. (Id. at p. 8.)

AMHA ultimately decided to proceed with eviction. (Docket #29-1 at p. 8.) The AMHA "Tenant Notes" from that hearing read as follows:

> HELD HEARING
>
> PROCEEDING WITH EVICTION.
>
> TENANT BROUGHT CASE WORKER DANA KNIGHT. DANA TRIED TO KEEP VALERIE CALM BUT SHE ENDED UP BEING VERY RUDE ACCUSING US OF LYING, AND SO WE JUST DECIDED TO PROCEED TO COURT AS WE ARE NOT TOLERATING ANY MORE DISRESPECT FROM HER WHICH IS PART OF THE REASON SHE WAS ISSUED AN EVICTION NOTICE IN THE FIRST PLACE, THE OTHER PART BEING SAFETY/HOUSEKEEPING ISSUES AND NOT COOPERATING.

(Docket #31-3 at p. 1.)

---

[5] Ms. Knight testified during her deposition that her duties as Ms. Sayles' Case Manager were to provide emotional support; assist Ms. Sayles with organization skills; and, to link Ms. Sayles with community resources as needed. (Docket #18 at p. 10.)

C.      **Request for Accommodation.**

On January 17, 2024, AMHA received a letter from Attorney Michael Hamper on behalf of Ms. Sayles.  Mr. Hamper requested, pursuant to 42 U.S.C. §§ 3604(f)(3)(B) and Ohio Rev. Code § 4112.02, that Ms. Sayles be granted reasonable accommodations to enable her to comply with the housekeeping requirements of the Lease.  (Docket #22-1 at p. 8; Docket #31-12 at p. 1.)  Mr. Hamper wrote that Ms. Sayles suffers from depression and anxiety, making major life activities difficult to manage and affecting her judgment and ability to deal with stressful and frustrating situations.  (Docket #31-12 at p. 1.)  Mr. Hamper stated that Ms. Sayles "sometimes struggles to summon and expend the energy necessary to maintain her household on a day-to-day basis" and that recent frequent hospitalizations contributed to these difficulties.  (Id.)  Mr. Hamper requested AMHA provide Ms. Sayles with three accommodations:

(1)    Provide her with additional time to clean and arrange her household in such a way that is in compliance with AMHA housekeeping rules.  This may include, for example, removing any obstructions that may be in passages in her home and to clean the floors of her apartment;

(2)    Allow her to sign a "last chance" agreement that provides for Ms. Sayles' ongoing commitment to meet bi-weekly with her case manager and promise to speak respectfully to AMHA personnel; and,

(3)    Provide her with written communication regarding inspections by AMHA at least 2 days in advance of the scheduled inspections.

(Id. at p. 2.)

On January 30, 2024, AMHA responded to Mr. Hamper's letter, agreeing not to proceed with an eviction based on the December 13, 2023 eviction notice, and offering Ms. Sayles one more chance to comply with the maintenance requirement of the Lease.  (Docket #31-13.)  AMHA stated, **"In the event AMHA determines that Ms. Sayles is in breach of the Lease as**

-8-

**a result of any future inspection of the Premises (or for any other reason, such as failure to pay rent), it will commence eviction proceedings following the issuance of statutory notice. No additional chances will be offered."** (Emphasis added.) AMHA also stated that it was not "conceding that Ms. Sayles is disabled in any way." (Id.) Mr. Hamper responded by email that same day, stating, "Thank you for your response. I appreciate the thoroughness with which you replied. Thank you, also, for agreeing not to pursue an eviction against Ms. Sayles based on the December 13, 20203 inspection. I think we can agree to disagree about whether Ms. Sayles has a disability for now. Regardless, I will relay to my client the importance of abiding by the lease and consult with her regarding your client's position." (Docket #31-28.)

On February 13, 2024 – two weeks after AMHA offered to give Ms. Sayles one more chance to comply with maintenance requirements and two months after her most recent failed inspection – AMHA posted written notice at the Property, advising that it would conduct a follow-up inspection on February 15, 2024. (Docket #21-8.)

The February 15, 2024 inspection – conducted by AMHA Executive Director Adams, AMHA Property Manager Tharp and AMHA Inspector Marc Dennis – revealed that the condition of the Property had not substantially changed since Ms. Sayles' failed December 13, 2023 inspection and AMHA determined that the Property was not in compliance with AMHA Housekeeping Standards.[6] (Docket #22-1 at p. 10; Docket #29-1 at p. 9.) Photos were taken

---

[6] The evidence of record details a tense exchange during the February 15, 2024 inspection. Ms. Sayles testified during deposition that she felt AMHA to be "aggressive" in the manner in which they took pictures of the Property. In her Declaration, Property Manager Tharp references her notes from the day of the inspection, in which she documented that Ms. Sayles, "threw a globe lamp cover out the door toward Mr. Dennis" as they were leaving the property and then "picked up the object and pressed it into Mr. Dennis's chest." Ms. Tharp also states in her Affidavit that this was the "'last straw' in a

-9-

during the inspection. (Docket #21-10 at Exhibit I1-I8.) On February 21, 2024, AMHA posted a new Eviction Notice, citing violations of Sections 8.11, 8.17, 13.1.7, 15.3.2 and 15.3.8 of the Lease, and stating AMHA was terminating Ms. Sayles' Lease for:

> **HISTORY OF FAILING TO MAINTAIN UNIT IN DECENT, SAFE AND SANITARY CONDITION DESPITE REASONABLE ACCOMMODATION GRANTED, HISTORY OF TALKING BACK AND THREATENING STAFF MEMBERS IS BECOMING MORE AGGRESSIVE AND EVEN PHYSICAL, HISTORY OF SERIOUS DAMAGE TO THE UNIT POSING HEALTH AND SAFETY ISSUES.**

(Docket #31-29.)(Emphasis added.)[7] Ms. Sayles was not given a written report identifying specific violations and was not given a follow-up inspection date. (Docket #29-1 at p. 9.)

In response to AMHA's Eviction Notice, Ms. Sayles requested an informal hearing with AMHA. (Id. at p. 10.) A hearing was conducted on March 12, 2024. AMHA Resident Services

---

series of rude and disrespectful actions by Sayles toward AMHA staff. (Docket #21 at pp. 5-6 and Exhibit B.) Ms. Sayles disputes Ms. Tharp's recollection and states she "rolled" the globe out of the Property toward them and that the globe was plastic, not glass. (Docket #16 at p. 73, Docket #26-2 at p. 28.)

[7] Both the December and March Eviction Notices cite Ms. Sayles' uncooperative behavior toward AMHA employees as one of the reasons for terminating Ms. Sayles' tenancy. Section 8.17 of the Lease requires Tenants, "To act in a cooperative manner with neighbors and AMHA staff. To refrain from and cause members of tenant's household or guests to refrain from acting or speaking in an abusive or threatening manner toward neighbors and AMHA staff." Tenant Notes kept by AMHA from May 24, 2023; May 25, 2023; September 25, 2023; December 13, 2023; December 14, 2023; January 4, 2024; and, February 15, 2024 document interactions between AMHA and Ms. Sayles which AMHA viewed as rude or aggressive. One of the accommodations Ms. Sayles' attorney requested in his January 2024 Letter to AMHA was for AMHA to allow Ms. Sayles to "sign a 'last chance' agreement that provides for Ms. Sayles' ongoing commitment to meet bi-weekly with her case manager and promise to speak respectfully to AMHA personnel."

Coordinator Regina Richardson served as the Hearing Officer.[8] (Id.) Ms. Richardson is a direct subordinate of AMHA Executive Director Adams. (Id.) Executive Director Adams and Property Manager Tharp were present at the hearing; asked questions of witnesses; made statements regarding the case; argued that AMHA's actions were justified; and, provided a closing statement on behalf of AMHA. (Id.).

During the hearing, Ms. Sayles explained that she was a person with a disability and was approved for Supplemental Security Income because she has "major depressive disorder and anxiety." (Docket #31 at p. 10.) Ms. Sayles' Case Manager, Ms. Knight, also discussed Ms. Sayles' status as a person with a disability "that affects her housekeeping and her life . . . [who] . . . needs reasonable accommodation . . . [her disability] is real, and it affects everything in her life." (Id.) Ms. Knight discussed how she believed Ms. Sayles was overwhelmed and unable to successfully clean the space due to her anxiety. Ms. Sayles' attorney, Mr. Hamper, made a verbal request that Ms. Sayles be provided with an additional 90 days to bring the Property into compliance and also requested housekeeping training. (Docket #22-1 at p. 10; Docket #29-1 at p. 10.)

On March 18, 2024, Ms. Richardson issued her decision, upholding AMHA's Lease termination and Eviction Notice. (Docket #29-1 at p. 10.) Ms. Richardson issued a letter finding that AMHA "had provided substantial evidence that they have gone over and beyond to work with Ms. Sayles on more than one occasion as well as met her Reasonable Accommodations that were requested on January 17, 2024." Further, Ms. Richardson stated, "I

---

[8]

Ms. Richardson testified during deposition that she received informal hearing officer training after being hired by AMHA and reviewed HUD regulations regarding the same. (Docket #26 at p. 113.)

-11-

also have a real concern as to how aggressive Ms. Sayles has become toward AMHA staff as well as the maintenance crew, which makes me question their safety." (Docket #27-8.) Ms. Richardson testified during deposition that she upheld the termination of Ms. Sayles' Lease, in part, because Ms. Sayles had a job that required her to clean in a way that was similar to cleaning at home. (Id. at p. 11; Docket #27 at p. 134.) Ms. Richardson testified she also based her decision on the fact that Ms. Sayles had already been given "several chances." (Docket #27 at p. 108.)

On March 22, 2024, Ms. Sayles filed an Administrative Appeal of AMHA's March 18, 2024 Decision in the Ashtabula County Court of Common Pleas, Case No. 2024 CV 00243. (Docket #31-23.) On April 9, 2024, while the Administrative Appeal was pending, AMHA filed a Forcible Entry and Detainer Action against Ms. Sayles in the Ashtabula Municipal Court, Case No. 24CVG00205. On April 29, 2024, Ms. Sayles, through Counsel, filed her Answer, Affirmative Defenses and Counterclaims in response to AMHA's Forcible Entry and Detainer Action. (Docket #22-1 at p. 11.)

On April 7, 2024, unbeknownst to AMHA, Ms. Sayles had signed a lease for a new, unsubsidized apartment in Willoughby, Ohio. (Docket #22-1 at p. 11.) Ms. Sayles testified during her deposition that she "started looking for places to live in December when they were threatening to evict me and then I tried to stay there and then they did another inspection and . . . they were threatening to evict me again." (Docket #16 at p. 19.) "I decided to move because they gave me three eviction notices within a five-month period and they weren't going to stop. They kept trying to evict me for any other reason. It was never going to end." (Id. at p. 21.) Ms. Sayles alleges that she "felt she had no choice but to move due to AMHA's ongoing behavior

and her belief that AMHA was never going to stop harassing her if she stayed." (Docket #29-1 at p. 11.) Ms. Sayles stated during her deposition, "Why would I stay somewhere where somebody is going to evict me, and that is going to be on my record . . . They targeted me, they harassed me . . . I am not going to stay somewhere where I'm constantly humiliated, harassed." (Docket #17 at p. 23.)[9]

A hearing on AMHA's forcible entry and detainer action was scheduled for May 13, 2024. (Docket #21-13 at p. 1.) However, Ms. Sayles ultimately agreed to vacate the Property by May 24, 2024 and AMHA agreed to dismiss the eviction proceedings. (Docket #22-1 at p. 11.) On May 15, 2024, Ms. Sayles voluntarily dismissed her Counterclaims against AMHA without prejudice. Ms. Sayles vacated the Property prior to May 27, 2024. (Id.) On May 23, 2024, Ms. Sayles dismissed her Administrative Appeal without prejudice.

## II.     Ms. Sayles' Claims Against AMHA.

On July 23, 2025, Ms. Sayles filed the instant Complaint in the Ashtabula County Court of Common Pleas, Case No. 2025CV0547. AMHA filed a Notice of Removal with this Court on July 24, 2025. (Docket #1.)

Ms. Sayles asserts claims for Breach of Contract (First Cause of Action); Wrongful Eviction and Constructive Eviction (Second and Third Causes of Action); and, Violations of the

---

9

Ms. Sayles also testified, "They gave me three eviction notices in a five month time. And they target me, harass me. They knew what they were doing. They were playing mind games with me. They targeted me, they harassed me. Her, Debbie Tharp, Sean Adams, and the Mark [sic] guy, they all like ganged up on me. Targeting me, harassing me. If you give somebody three evictions within a five month time apparently they don't want you there. Apparently they are going to keep bullying you, harassing you until they get you kicked out of there. To me, they personally thought it was funny. It was all a game to them." (Docket #17 at p. 23.)

-13-

Federal Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and the Ohio Fair Housing Act, Ohio Rev. Code § 4112.02(H) (Fourth and Fifth Causes of Action).  Specifically, Ms. Sayles alleges that AMHA breached the terms of the Lease by failing to properly conduct housing inspections as required by Section 15.1 in December 2023 and February 2024; failing to advise her of the specific corrections required for Plaintiff's home to be in compliance with the housekeeping requirements of the Lease Agreement after the December 2023 and February 2024 inspections as required by Section 15.1; failing to advise her that housekeeping training was available to her after the December 2023 and February 2024 inspections as required by Section 15.1; failing to follow informal hearing procedures set forth in Section 7.10 and 24 CFR 966.4(l)-(n); failing to provide reasonable accommodations as contemplated by Section 3.10.2; and, seeking to evict her for an improper reason, in violation of 24 CFR 966.4(l).

Further, Ms. Sayles alleges that AMHA was unjustified in filing an eviction against her on April 4, 2024 because her Lease had not expired and she was not in default of any Lease terms sufficient to sustain an eviction action.  Ms. Sayles alleges that in filing the April 4, 2024 eviction action, AMHA interfered with her possession and enjoyment of the Property; that AMHA filed the Eviction Notice "with the purpose to cause Plaintiff to vacate the premises;" and, that Ms. Sayles vacated the Property on May 27, 2024 because she felt compelled to leave.

Finally, Ms. Sayles alleges that AMHA violated the FHA and OFHA by denying her requests for an accommodation.  Ms. Sayles states that she is a person with a disability, "diagnosed with a variety of psychosocial disabilities including major depressive disorder, generalized anxiety disorder, somatic symptom disorder, and adjustment disorder with mixed anxiety and depressed mood."  Ms. Sayles states that her "disabilities substantially limit major

-14-

life activities, including, but not limited to: sleeping, working, seeking medical treatment, concentrating, organizing, learning, and interacting with others." (Docket #31 at p. 8.)

Ms. Sayles asserts that AMHA knew of her disability; that on January 17, 2024 and again on March 12, 2024, she requested a reasonable accommodation related to her tenancy; and, that AMHA effectively denied her reasonable accommodation requests and failed to engage in the interactive process contemplated by the FHA when addressing Ms. Sayle's accommodation requests. Ms. Sayles states that Mr. Hamper's January 17, 2024 letter to AMHA identified Ms. Sayles as a person with a disability and requested additional time to comply with housekeeping requirements as a reasonable accommodation for her disability. Further, Ms. Sayles states that prior to that time, since at least June 13, 2013, AMHA was aware that she is a person with a disability, or is considered a person with a disability, as she has consistently reported her receipt of disability-based Supplemental Security Income as part of the HUD certification process and has been granted a Community Service Exemption by AMHA based on her self-reporting of disability to AMHA. (Id. at pp. 8-9.)

## III.    Motions for Summary Judgment.

On January 30, 2026, AMHA filed its Motion for Summary Judgment. (Docket #22.) On March 2, 2026, Ms. Sayles filed her Motion for Partial Summary Judgment (Docket #29.)

A hearing on the Parties' Motions was held on March 19, 2026. (Docket #36.) The Motions are fully briefed.

## IV.    Standard of Review.

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

-15-

law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Mich. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce

-16-

evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6ᵗʰ Cir. Ky. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## V.    Discussion.

The Fair Housing Act prohibits discrimination in the sale or rental of housing and in the provision of housing services or facilities "because of race, color, religion, sex, familial status, or

-17-

national origin." 42 U.S.C. § 3604(a), (b).  Section 3604(f)(3)(B) defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

To establish a reasonable accommodation claim, a plaintiff must show that (1) she is disabled, (2) she requested an accommodation, (3) the defendant housing provider refused to make the accommodation, (4) the accommodation was reasonable and necessary, and (5) the defendant knew or should have known about the disability at the time of the refusal.  *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. Tenn. 2014).  "Accommodations required under the Act must be both reasonable and necessary to afford the handicapped individual an equal opportunity to use and enjoy a dwelling." *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1043-44 (6th Cir. Ohio 2001).

"An accommodation is 'reasonable' when it imposes no 'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens.'" *Howard v. City of Beavercreek*, 276 F.3d 802, 805-06 (6th Cir. Ohio 2002)(citation omitted). "In order to prove that an accommodation is 'necessary,' '[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'" *Id.* (citation omitted).  The plaintiff has the burden of demonstrating the reasonableness and necessity of a requested accommodation. *Hollis*, 760 F.3d at 543. "Whether a requested accommodation is required by law is 'highly fact-specific, requiring case-by-case determination.'" *Groner*, 250 F.3d at pp. 1043-44 (citation omitted).  The Ohio Fair Housing Act, Ohio Rev. Code § 4112.02(H), is analogous and equivalent to the Fair Housing Act and is interpreted and analyzed

-18-

under the same standard. A violation of the Fair Housing Act constitutes a violation of the OFHA.

Regardless of whether Ms. Sayles was disabled for purposes of the FHA and OFHA, an issue on which the Parties disagree,[10] AMHA did not refuse to provide Ms. Sayles with an accommodation. In his January 17, 2024 letter to AMHA, Ms. Sayles' attorney asked that Ms. Sayles be provided with additional time to clean and arrange her house so as to comply with AMHA housekeeping rules; that she be permitted to sign a "last chance" agreement (the letter also referencing Ms. Sayles promise to speak respectfully to AMHA personnel); and, that she be given at least 2 days notice prior to any scheduled inspection. On January 30, 2024, AMHA responded, agreeing not to proceed with eviction, offering "one more chance" for Ms. Sayles to

---

[10]

As set forth above, Ms. Sayles states that she is a person with a disability, "diagnosed with a variety of psychosocial disabilities including major depressive disorder, generalized anxiety disorder, somatic symptom disorder, and adjustment disorder with mixed anxiety and depressed mood." Ms. Sayles states that her "disabilities substantially limit major life activities, including, but not limited to: sleeping, working, seeking medical treatment, concentrating, organizing, learning, and interacting with others." (Docket #31 at p. 8.) Dr. Lynn Luna Jones was retained as an expert witness on behalf of Ms. Sayles and, based on her evaluation, diagnosed Ms. Sayles with generalized anxiety disorder; somatic symptom disorder; and, adjustment disorder with mixed anxiety and depressed mood. Dr. Luna Jones found Ms. Sayles to be a person with a disability for purposes of the Fair Housing Act. (Docket #31-7.)

AMHA argues that the evidence of record does not show that Ms. Sayles has "an impairment that prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives." Specifically, AMHA cites Ms. Sayles' testimony during her deposition that she has no difficulty caring for herself; works 18-32 hours a week as a cashier at Circle K; that she sometimes gets tired and overwhelmed and sometimes she has pain in her stomach and has to take 15-20 minute breaks while doing chores, but that she is able to perform routine household tasks; that she was able to keep her house clean; that she was able to box things up and move them around; and, that she has never asked AMHA for assistance cleaning. (Docket #16 at p. 87; Docket #39 at p. 11.)

-19-

comply with the Lease and agreeing to give Ms. Sayles 48 hours notice before a reinspection. The letter stated, "No additional chances will be offered." Ms. Sayles' attorney acknowledged and accepted this accommodation. A little over two weeks later, AMHA reinspected the Property and discovered the housekeeping violations had, in large part, not been remedied and posted an Eviction Notice. The fact that Ms. Sayles did not bring the Property into compliance during the period of accommodation does not change the fact that an accommodation was in fact granted. AMHA made a good faith, reasonable effort at accommodation.

The informal hearing that followed was conducted on March 12, 2024, nearly a month after Ms. Sayles' final failed inspection in February. At that time, Ms. Sayles' attorney requested Ms. Sayles be given an additional 90 days to bring the Property into compliance. However, Ms. Sayles has made no showing that even if eviction proceedings were once again withdrawn or delayed that she would have been able to comply with the terms of the Lease. The evidence plainly suggested otherwise. Ms. Sayles' had repeatedly violated the terms of the Lease over a period of years and, after having been granted the same type of accommodation in January that she requested again in March, the Property was still noncompliant. Ms. Sayles has failed to demonstrate that another extension, under the facts and circumstances of this case, was reasonable or that another delay would have served any useful purpose. Accordingly, AMHA is entitled to summary judgment as to Ms. Sayles' FHA and OFHA claims.

Likewise, AMHA is entitled to summary judgment as to Ms. Sayles' Breach of Contract claim. Section 13.1.7 permits AMHA to terminate a Lease when a Tenant repeatedly damages or creates physical hazards to the Property. As set forth above, Ms. Sayles failed numerous housekeeping inspections between and June 2019 and May 2023 and was notified, in writing,

after each of these failed inspections of the specific corrections needed and was offered

housekeeping training and assistance.  While the Lease provides a process for notice and the

opportunity for a Tenant to cure housekeeping deficiencies, there is nothing in the Lease to

suggest that this notice and cure process must continue indefinitely or that it precludes AMHA

from deciding to terminating the Lease after repeated violations of the Housekeeping Standards.

AMHA did fail to comply with Section 7.10.3 of the Lease, which provides that

"grievance hearings must be conducted by an impartial person or persons appointed by AMHA,

other than the person who made or approved AMHA action under review, or a subordinate of

that person."  The final AMHA hearing regarding Ms. Sayles' eviction was conducted by Ms.

Richardson, a subordinate of AMHA Executive Director Adams.  Further, prior to issuing her

final decision, Ms. Richardson spoke with Ms. Tharp and may have reviewed documents from

Ms. Sayles' AMHA file that were not specifically referenced during the hearing, both of which

Ms. Sayles argues breached the Lease by violating 24 C.F.R.56(b)(5), which provides that

hearing officer decisions be based "solely and exclusively upon the facts presented at the

hearing."[11]  However, to establish a claim for breach of contract, a plaintiff must prove (1) the

---

[11]
     The Court has reviewed the deposition testimony of Ms. Richardson in its
entirety, along with the Transcript from Ms. Sayles' March 12, 2024 hearing, in its
entirety.  There is no evidence to suggest that any of the documents Ms. Richardson may
have considered or discussions she may have had after the hearing fell outside the scope
of the information available to all Parties prior to or at the time of Ms. Sayles' hearing.
The Transcript suggests that the Parties had exchanged copies of relevant documents and
pictures prior to or at the time of the hearing.  (Examples of reference to these documents
and photos can be found at Docket #26-2 at pp. 2-7.) While Ms. Richardson did not recall
having Mr. Hamper's letter or AMHA's response prior to the hearing, AMHA's response
was read out loud during the hearing.  (Docket #26-2 at p. 5.)  Ms. Richardson testified
that she conferred with Ms. Tharp after the hearing to ensure that "one more chance" to
comply had been given, as promised in AMHA's response. (Docket #27-2 at p. 106-08.)

-21-

existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach. *In re FifthThird Early Access Cash Advance Litig.*, 925 F.3d 265, 275 (6th Cir. Ohio 2019.) Ms. Sayles has failed to offer proof of damages or loss stemming from the fact that Ms. Richardson conducted the March 12, 2024 informal hearing or from any review of Ms. Sayles' file documents or discussion with Ms. Tharp that may have occurred after the hearing.[12]

Finally, the Court turns to Ms. Sayles' wrongful and/or constructive eviction claims. As set forth in detail above, AMHA was within its rights under the Lease to terminate Ms. Sayles' tenancy. Ms. Sayles voluntarily signed a lease for a new, unsubsidized apartment and soon after agreed to voluntarily vacate the Property. AMHA then dismissed the forcible entry and detainer action and Ms. Sayles dismissed her Counterclaims in that case. Ms. Sayles was not wrongfully evicted. Further, constructive eviction occurs when a landlord interferes with a tenant's possession and enjoyment of the premises and the acts of interference by the landlord compel the tenant to leave. *Foote Theatre, Inc. v. Dixie Roller Rink, Inc.*, 14 Ohio App.3d 456, 457, 471 N.E.2d 866 (3rd Dist. Ct. App. Ohio 1984). The theory of constructive eviction is that the tenant is in effect dispossessed, though not forcibly deprived of possession. *Id.* at 457-458. Ms. Sayles states that she found a new apartment because she felt harassed by AMHA's repeated threats that she would be evicted and that "AMHA took consistent, escalating action against Ms. Sayles to get her to vacate her home." (Docket #31 at p. 19.) However, the multiple reinspections and

---

[12]

It is important to note that nothing in the Record suggests Ms. Richardson was biased or improperly influenced at any time during the hearing and decision process. There is no evidence that Ms. Sayles suffered any prejudice as a result of Ms. Richardson's participation.

multiple starts and stops during the eviction process that Ms. Sayles' argues compelled her to leave the Property were the direct result of Ms. Sayles' repeated violations of the express terms of the Lease and the fact that AMHA gave Ms. Sayles multiple chances over the course of several years to comply with the Housekeeping Standards.  The evidence of record is insufficient to support Ms. Sayles' constructive eviction claim.  AMHA is entitled to summary judgment as to Ms. Sayles' wrongful and/or constructive eviction claims.

## VI.     Conclusion.

For the foregoing reasons, the Motion for Summary Judgment filed by AMHA (Docket #22) is GRANTED.

The Motion for Partial Summary Judgment filed by Ms. Sayles (Docket #29) is hereby DENIED.

This case is hereby terminated.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
United States District Judge

DATED: _May 29, 2024_

-23-